# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

IN RE:  USA v. MST, etc.                          *
                                                   *
                                                   *          Case Number: 2:18-mc-00127-NT
                                                   *

## MOTION OF MSSRS. HORNOF, KORDIC AND ZAK FOR A HEARING AND ORAL ARGUMENT

NOW COME Jaroslav Hornof, Damir Kordic, and Lukas Zak (the "movants") and moves this Honorable Court to entertain oral argument on the movants "Motion for Relief Pursuant to 18 U.S.C. §3771 and 33 U.S.C. §1908(a),".dated May 3, 2018 (the "Motion").  The Motion seeks to protect the movants' rights and claims in and concerning the criminal matter pending before this Honorable Court styled as "United States of America v. MST Mineralien Schiffarht Spedition Und Transport GmbH, et al.," and which bears docket number 2:17-cr-117-NT (the "Criminal Case").

Unless the government waives or is deemed to have waived its right to dispute the factual assertions made by the movants in their detailed submissions, the movants also request and evidentiary hearing.

The movants' prior submissions have been extensive.  Against the possibility the Court has yet to review them and because the docket reflects that the sentencing of the Criminal Case is scheduled for next month, the movants summarize their prior filings in support of their motion for argument and hearing, as follows:

In early May the movants were in the United States pursuant to the Court's orders and the government's subpoenas.  At the time, they filed the Motion and requested an evidentiary hearing on it.  At the Court's request, they supplemented and supported the Motion by affidavits

executed and filed by each of the movants on May 7, 2018.  They also filed their "Proffer of Mssrs. Hornof, Kordic and Zak" on May 14, 2018 setting forth additional facts the movants believe to be true based on their and counsel's investigation.

After filing their affidavits, the movants remained in the United States to afford the government and the defendants an opportunity to review their affidavits and cross-examine them should any dispute exist.  During a phone conference conducted on or about May 7, 2018, the Court directed the government and the defendant to review the affidavits and request a hearing to cross-examine the movants concerning any factual dispute.

Neither the government nor either defendant requested an opportunity to examine the movants.  The government filed an opposition to the Motion on June 1, 2018, but the government has not filed any affidavits or exhibits disputing any of the detailed factual assertions contained in the movants' affidavits and proffer.  Without citing any such record evidence, however, the government's opposition does quarrel with some of the movants' factual assertions. As the government has not submitted any evidence to support the factual assertions contained in its opposition, the movants respectfully submit that the government ought to be deemed to have waived any right to dispute the movants' affidavits and proffer.

If, however, the Court is not inclined to find such a governmental waiver, the movants respectfully renew their request for an evidentiary hearing on their motion, and they remain confident the government can and will present no evidence to support its mistaken and false assertions of fact.

Without limiting their prior submissions, the movants summarize those key facts and the movants' claims and contentions below:

**I.      The Movants' Claims and Contentions.**

The initial argument on the motion at which ruling was reserved suggested there may be confusion concerning the movants' claims and rights.  To address the risk of confusion, the movants previously clarified (in their proffer) and again clarify their contentions and requests for relief as follows:

1.  ***The movants are victims***.

   Each movant was a victim of the crimes charged in each of the nine counts of the Indictment in the criminal case within the meaning of 18 U.S.C. §3771(d)(3), and as such have various statutory rights, including the right to receive notice of proceedings in the associated criminal case, *see* 18 U.S.C. §3771(a)(2), to be present during proceedings in that criminal case, 18 U.S.C. §3771(a)(3), to be heard concerning appropriate outcomes including at plea and sentencing proceedings, 18 U.S.C. §3771(a)(4), and to be treated with fairness and with respect for their dignity and privacy, 18 U.S.C. §3771(a)(8).  The harm done to the movants by the charged criminal conduct is summarized in the movants' proffer and detailed in their affidavits.

2.  ***Even if the movants are not "victims," they have standing and should be heard concerning whether to accept the plea agreement, which should be rejected in either event.***

   Even if denied victim status under 33 U.S.C. §1908(a), each movant nevertheless has standing to object to the plea agreement and to be heard concerning whether it should be accepted since the plea agreement (a) does not fully disclose agreements between the government and the defendants, (b) is intended by a dishonest contrivance to deprive this Honorable Court of its rights and duty to decide what, if any, portion of the fine under section 1908(a) should be awarded to the movants as the individuals who provided information leading to the conviction and penalties, and (c) provides

3

for the Court to impose a fine not otherwise authorized by statute based on a vague, false and fraudulent "stipulation" concerning a mixed question of law and fact.  That mixed question is whether the defendant (or any person) "derived pecuniary gain from the offense" charged in Count Nine, (i.e., obstructing justice by having an inaccurate oil record book) and whether the amount of any such gain was at least $1,600,000.  Absent gain, the statutory maximum fine for Count Nine, a class D felony, would be $500,000.  18 U.S.C. §371(3)(c).  But the Alternative Fines Act, codified at 18 U.S.C. §371(d), allows for a fine of up to twice any such gain.  Because the Alternative Fines Act allows for a greater penalty the existence of such gain – and the circumstance that the offense was the "but for" and "proximate cause" of the gain – is an aggravating element that ordinarily must be proven beyond a reasonable doubt to a jury.  *Southern Union Co. v. United States*, 567 U.S. 343 (2012)[holding that *Apprendi* applies to statutory provisions allowing for enhanced fines]; *United States v. Sanford Ltd.*, 878 F. Supp. 137, 148-50 (D.D.C. 2012); *United States v. BP Products North America Inc.*, 610 F. Supp. 2d 655, 695-96 (S. D. Tex. 2009).  If a defendant pleads guilty, of course, there is no jury trial, but the Court is nevertheless obligated to determine that there is a factual basis for the defendant's plea.  Fed. R. Crim. P. 11(b)(3).

No factual basis for the application of the Alternative Fines Act was addressed at the change of plea proceeding, and none is addressed in the written plea agreement (which was made available to the movants only after the change of plea proceeding).  Instead, the agreement includes a "stipulation" that allocating the entire $3,200,000 fine to Count Nine is "appropriate," but no explanation of the factual or legal basis for that assertion.  As explained in greater detail in the movants' legal and factual

submissions, the fine is neither "appropriate" nor lawful under Count Nine – and cannot be properly supported by the Alternative Fines Act (assuming, as movants believe, that the government intended the vague stipulation to reference that act). The $3,200,000 fine was actually negotiated, agreed upon and allocated under Counts One through Eight, each of which charges a violation of the Act to Prevent Pollution from Ships ["APPS"]. The total fine allocated under those counts would of course be fully legal and appropriate, since each carries a $500,000 maximum. But the government insisted the fine be "moved" to Count Nine – based on a vague, false and fraudulent stipulation that doing so was "appropriate" and a secret side agreement that the defendant would agree with whatever factual analysis the government might *later* conjure under the Alternative Fines Act – solely for the purpose of defeating the movants' statutory rights to seek an award of any fine imposed under section 1908 of APPS.

3. ***The Court could and should award the movants a reward, even if it accepts the plea agreement.***

The government appeared to concede at the initial argument that the plea agreement is intended to defeat the movants' claims and rights. (Government counsel specifically asserted that if the Court approves the plea agreement none of the fine could be awarded to the movants, and the government subsequently asserted that position in its opposition.) The movants respectfully disagree. The plea agreement should be rejected for the reasons summarized in the preceding paragraph. But if the Court accepts the Agreement (which it should not), the movants would and do contend the Court should, under section 1908(a), award them shares of the proposed fine. An issue under that scenario would exist concerning whether section 1908(a) authorizes the Court to award informants a share of a fine where, as would then be the

case here, the defendant is charged with and at the change of plea proceeding admits facts the Court has determined constitute several (in this case eight) criminal violations of APPS and MARPOL, but the government and the defendant structure the plea agreement to include a single guilty plea to another charge that includes all the same elements.  The movants respectfully contend and have argued in their filing that the law, including the precise language of section 1908(a), compel the conclusion the Court could and should award a portion of the fine to the movants.

Although the government has opposed the movants' motion, it has submitted no exhibit, proffer or affidavit to refute the movants' detailed factual submissions.  The government does not concede, for example, that it had and has a secret side agreement with MST to support whatever false "gain" analysis the government would conjure *later*; but the government's objection did not directly dispute the proffered assertions, either.  The government's objection speculates that MST had business "gain," but as explained in the movants' reply, the government assumes (without articulation) that the crime charged need not be the but-for or proximate cause of that gain, and the government submitted no evidence whatsoever to support its speculation.

**II.  The Undisputed Facts**

As requested by the Court, the witnesses filed affidavits summarizing the testimony they would have offered if allowed to testify in support of their motion.  Those affidavits and the movants' proffer explained how the movants have been injured and victimized by the defendants' crimes and the scheme carried out by Chief Engineer Babarovic, including as follows:

A. *Jaroslav Hornof*

1. Mr. Hornof was directly victimized by the false and missing oil record book entries and the attempt to cover up pollution, tank transfers and other engine room activities

6

because, as an engine room officer, he needed to rely on the ship's official engine room records, including records required by MARPOL.  (Hornof Affidavit ¶¶ 5-6.)

2.  Chief Engineer Babarovic, Mr. Hornof's superior within MST, lied to Mr. Hornof concerning the same activities he misrepresented in the oil record book and related ship documents; he did so for the purpose of deceiving Mr. Hornof into allowing the misconduct to continue.  (Hornof Affidavit ¶¶ 8.)

3.  As a young maritime engineer, Mr. Hornof depends on the marine environment and the courtesy port states extend to visiting mariners; the misconduct of Mr. Babarovic in his capacity as an agent for MST threatened and damaged the standing of MST ships and crewmen, including Mr. Hornof.  (Hornof Affidavit ¶¶ 6(c).)

4.  Mr. Hornof felt morally and ethically obligated to confront his MST superior and insist that the illegal activity stop; when it did not stop, he gathered proof positive of the misconduct and presented it to the master and defendant MST's home office officials; when they seemed to doubt his report, he redoubled his efforts, all of which consumed many hours of Mr. Hornof's time and placed him at risk for his job and personal safety at sea.  (Hornof Affidavit ¶¶ 6(e).)

5.  Mr. Hornof indeed was physically threatened on the high seas by Mr. Babarovic because of his efforts to report and end the pollution and false entries and statements. (Hornof Affidavit ¶6(d).)

6.  The misconduct of Mr. Babarovic on behalf of MST, which according to the Indictment and in fact, included polluting the high seas and making false records to cover up that pollution, created a risk that any port state might detain the vessel and crew with knowledge of the misconduct.  (Hornof Affidavit ¶¶ 5-6.)

7.  In Canada and Brazil, Mr. Hornof spent many hours disclosing the misconduct of Mr. Babarovic and MST to officials from MST, Liberia, and private auditors.  He was assured and believed full disclosure was made to the United States, but according to the government's Trial Brief full disclosure was not made.  MST's failure to make disclosure satisfactory to the government created the risk Mr. Hornof might be held in Maine, and he was. (Hornof Affidavit ¶¶ 6(e).)

8.  As a result of the misconduct by Mr. Babarovic and MST's apparent failure to make sufficient disclosure, Mr. Hornof's permission to enter the United States was revoked and he was detained onboard the vessel for over a week.  (Hornof Affidavit ¶¶ 6(f).)

9.  To secure the release of their vessel, the defendants entered into a security agreement with the government; in that agreement, the defendants agreed, without his consent, to modify Mr. Hornof's contract, to force Mr. Hornof off the vessel, and to leave him behind in this foreign port; they did so, and he was held here for two-and-a-half months. (Hornof Affidavit 6(g).)

10. While he was held here pursuant to the defendants' agreement, Mr. Hornof's pregnant mother's wife died, and Mr. Hornof was unable to travel home to assist his wife, an only child, deal with the loss. (Hornof Affidavit ¶¶ 6(i).)  Of course, none of that would have occurred but for MST's misconduct and its decision to trade Mr. Hornof's liberty for its vessel.

B.  *Damir Kordic.*

1  As the Government's Trial Brief explains, Mr. Babarovic, Mr. Kordic's supervisor at MST, "ordered" Mr. Kordic to transfer what in fact were oily bilge wastes from one tank to another and to discharge them overboard on the high seas.  (See Kordic Affidavit, ¶6.)

8

2   Mr. Kordic did so, in part because the "orders" came from his superior, but also because Mr. Babarovic made the same false statements to Mr. Kordic that he made in the oil record book – falsely claiming that the complex systems of modified plumbing, and the hoses, valves and pumps were only being used for lawful purposes. (Kordic Affidavit ¶6.)  As Mr. Kordic's affidavit explains, the engine space is massive, and the nature of what was being accomplished was not clear.  Mr. Hornof's affidavit explains in detail that the altered piping was designed and, together with pumps and hoses, employed for the lawful and environmentally-sound practice of capturing and discharging engine-coolant condensate before it reached the bilges and bilge tanks.  Mr. Hornof's detailed investigation demonstrated that other chief engineers used the altered piping along with hoses and pumps only for that proper purpose.  (Hornof Affidavit ¶¶ 8-9.)

3   Because of the criminal misconduct by Mr. Babarovic that has now been acknowledged and admitted by MST, Mr. Kordic's permission to enter the U.S. was revoked and he was detained onboard the vessel for over a week.  (Kordic Affidavit ¶8(e).)

4   To gain the release of its vessel, MST signed an Agreement on Security agreeing to force Mr. Kordic off the vessel and leave him behind in a foreign country.  He was held in this foreign country of approximately two-and-a-half months.  (Kordic Affidavit ¶8(f).)

5   Although Mr. Kordic was "ordered" by his superior at MST to participate in what in fact were illegal discharges, he has now been fired by MST and, at age 59, is unlikely to ever work again in the maritime industry.  (Kordic Affidavit ¶8(c).)  He believes he has "lost his career" as a result of MST's actions.  (Kordic Affidavit ¶¶ 8(d).)

C. *Lukas Zak*

1.  Mr. Babarovic similarly "ordered" Mr. Zak's participation.  (Zak Affidavit ¶6.)

2.  Mr. Babarovic deceived Mr. Zak, just as he sought to and did deceive others, falsely claiming that "it was a proper procedure."  (Zak Affidavit ¶6.)

3.  From Mr. Hornof, Mr. Zak learned that, instead, the Mr. Babarovic was misusing a system designed for the lawful purpose of capturing and discharging only clean condensation, and that the result was illegal pollution; and he helped Mr. Hornof unravel the history and the misconduct by answering all Hornof's questions.  (Zak Affidavit ¶7.)

4.  In addition to having been duped into polluting, the misconduct of Babarovic and MST, including MST's apparent failure to make proper disclosure, created a risk that Mr. Zak might be held by any port state, and of course that is exactly what happened. (Zak Affidavit ¶¶ 7-8.)

5.   When the vessel arrived in Portland, Mr. Zak was at the end of his contract.  He had been at sea for 18 of the prior 19 months. He was scheduled to fly home, and the U.S. Customs and Border Patrol granted him permission to enter and fly home on the flights scheduled for the next day, July 8, 2017.  Because of the misconduct by Mr. Babarovic and MST, Mr. Zak's permission to enter the U.S. was revoked and he was detained onboard the vessel for over a week.  (Zak Affidavit ¶8(e).)

6.  To gain the release of the vessel, MST signed an Agreement on Security agreeing to extend Mr. Zak's contract without his permission or consent, to force him off the vessel and leave him behind in a foreign country.  He was held in this foreign country for approximately two-and-a-half months.  (Zak Affidavit ¶8(e).)

7. Although Mr. Zak was "ordered" by his MST superior to do everything he did, he has now been fired by the only maritime firm he has ever worked for, MST.  (Zak Affidavit ¶8(d).)  He has not worked in the maritime industry since, and whether he has a future in the maritime industry "is now in doubt."  (Zak Affidavit ¶8(h).)

The movants have pressed the government and MST's lawyers to explain the bizarre plea agreement that is clearly designed solely to defeat the movants' rights.  Based on the government's and MST's limited statements, the movants' knowledge, and the assertions in the government's objection, the movants respectfully submit that the following facts are established – or at least should be treated as established -- unless and until contrary evidence is presented at an evidentiary hearing:

1. During the time period referenced in Count Nine, *i.e.,* between September 14, 2016, and June 19, 2017, no person (other than perhaps Mr. Babarovic, who may have benefitted by keeping his job) derived any gain from the inaccurate record keeping or the crime charged in Count Nine.  (*See, e.g.,* Hornof Affidavit, ¶ 21.)

2. The M/V Marguerita was outfitted with a working oily water separator that competent and caring chief engineers could have operated, and did operate, during that time period to protect the environment.  (*See, e.g.,* Hornof Affidavit, ¶ 21.)

3. Those other engineers used the altered piping, together with valves, pumps and hoses, to capture, transfer and discharge through the gray water system the substantial clean condensate generated by the main engine's cooling system, but they used the oily water separator to safely treat and discharge bilge water.  Mr. Babarovic, on the other hand, used a good, lawful system, designed to avoid overwhelming the vessel's pollution control equipment, illegally to bypass the pollution control equipment, polluting the high seas.  He did so until Mr. Hornof uncovered, investigated and put an end to the illegal activity.  (*See, e.g.,* Hornof Affidavit, ¶¶ 9-13 & 21.)

4.   In addition to making full and complete disclosures to U.S. officials, Mr. Hornof made full and complete disclosure to officials from the Republic of Liberia, the flag state and therefor the country with exclusive jurisdiction over the actual pollution events.  Because of Mr. Hornof's disclosure, "keeping the inaccurate record book did not succeed in keeping the misconduct secret from the entity known as the 'Administration'" for purposes of MARPOL and did not avoid whatever sanction or remedy Liberia may impose.  (Hornof Affidavit, ¶ 22.)

5.   The plea discussions were conducted by Senior Trial Attorney Richard Udell and by attorney George Chalos; Mr. Udell made several plea proposals not disclosed to the Court.

6.   The government and MST negotiated for fines for each APPS count, and the defendants tentatively agreed to pay fines based on APPS convictions.

7.   Mr. Udell then insisted, however, that the fine be assigned to the obstruction count solely to try to defeat the movants' rights.

8.   Mr. Udell insisted on the "stipulation" that the fine was "appropriate" under section 3571.  When the movants heard that a plea agreement might be reached and might be so structured in an attempt to defeat their rights, they objected and asserted that such a "stipulation" cannot be used for a dishonest or fraudulent purpose and that the Court cannot accept a guilty plea to an aggravated offense based on a dishonest stipulation not supported by a good-faith belief in underlying facts.

9.   In response to the movants' concerns, Mr. Udell insisted that MST support and agree to whatever bogus factual explanation the government might *later* conjure to support a contention that the offense charged in Count Nine resulted in "pecuniary gain" and that the gain was sufficient to move $3,200,000 negotiated for several APPS counts to the single obstruction count under the Alternative Fines Act.

10. MST's lawyers and attorney Udell knew that stipulation was false and misleading and that MST did not have $1,600,000 gain – or in fact any gain – proximately caused by the charged offense.

11. The parties' dishonest stratagem and false stipulation was and is designed solely to defeat the movants' claims and the Court's discretion to award the movants a reward should the Court decide they are deserving.

12. There is no good faith or factual basis for MST's plea to an "aggravated" form of obstruction of justice, i.e., obstruction of justice resulting in gain.

13. Attorney Udell insisted on the dishonest plea agreement and false stipulation to penalize the movants for politely attempting to protect their liberty interests while also agreeing to provide and in fact providing all of the information and evidence leading to the indictment and MST's agreement to plead guilty to the APPS counts and to pay a fine of $3,200,000 under those counts – and to its subsequent agreement to "move" the fine to Count Nine.

14. Attorney Udell and other government lawyers also seek to punish the movants for initially cooperating with the MARPOL Administration and insisting that the pollution stop, rather than allowing it to continue until the vessel arrived in U.S. waters – and reporting it only then.

**Wherefore**, the movants request argument on their motion and, unless the government stipulates or is deemed to have stipulated to the foregoing factual assertions, the movants again request an evidentiary hearing.

Respectfully submitted this 9th day of August, 2018.

 _/s/ Edward S. MacColl_____
Edward S. MacColl *(MBN 2658)*
Counsel for Jaroslav Hornof, Damir Kordic and
Lukas Zak

THOMPSON, MACCOLL & BASS, LLC, P.A.
15 Monument Square, 4th Floor
P.O. Box 447
Portland, ME  04112-0447
(207) 774-7600

## **CERTIFICATE OF SERVICE**

I hereby certify that on this day I have served the foregoing by filing it via the Court's ECF system, which will cause served to be made on all parties in this matter and all counsel of record in the underlying criminal matter.

 /s/ Edward S. MacColl
Edward S. MacColl